IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FLORENCE JACKSON, | * | |
| KELLY BLACKWELL | * | |
|     Plaintiffs, | * | |
| | * | |
|     v. | * | Civil No. JFM 08-3103 |
| | * | |
| MAYOR AND CITY COUNCIL OF | * | |
| BALTIMORE CITY | * | |
|     Defendant. | * | |
| | * | |
| | ***** | |

**MEMORANDUM**

Plaintiffs Florence Jackson ("Jackson") and Kelly Blackwell ("Blackwell") (collectively, "Plaintiffs") bring suit against the Mayor and City Council of Baltimore (collectively, "the City" or "Defendant") alleging retaliatory termination under the Fair Labor Standards Act ("FLSA") and Maryland State Law. The City has moved to dismiss Plaintiffs' claims or, in the alternative, for summary judgment. The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6 (D. Md. 2008). For the reasons stated below, the City's motion is denied without prejudice to its refiling, if appropriate, after discovery has been completed.[1]

**I.**

The following facts are uncontroverted or set forth in the light most favorable to the

---

[1] Plaintiffs have filed a Rule 56(f) motion for additional discovery. Under this rule, a continuance of summary judgment proceedings is appropriate where further discovery is needed in order to uncover "facts essential to justify [a party's] opposition." Fed. R. Civ. P. 56(f). In light of my ruling denying the City's motion, Plaintiffs' motion for continuance is denied as moot.

plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Plaintiffs Jackson and Blackwell began their employment as dispatchers for the Baltimore City Sheriff's Office in October 2001 and July 2002, respectively. (Compl. ¶¶ 6, 8; Def.'s Mem. in Supp. of Mot. to Dismiss or in the Alternative Mot. for Summ. J. ("Def.'s Mem.") Exs. 1, 2.) Plaintiffs previously filed a complaint in this Court against the City in February 2007, alleging that the Sheriff's Office had deprived them of minimum wage and overtime pay owed to them under state and federal law. (Compl. Ex. 1.) The parties reached a settlement agreement in that action in January 2008. (Compl. ¶ 17.) Plaintiffs were terminated from their dispatcher positions in February 2008. (*Id.* ¶¶ 21, 22.)

Plaintiffs allege that they never received any written unsatisfactory performance evaluations or appraisals and were never suspended or placed on probation during their employment. (*Id.* ¶¶ 18, 19.) They claim that they were fired without being warned that they had engaged in any misconduct or were not performing their jobs satisfactorily, which they claim is a violation of the City's progressive disciplinary policy. (*Id.* ¶¶ 23-26.) Plaintiffs allege that false and pretextual reasons were given for their termination and that the real reason was retaliation for their prior complaint about the City's violation of Maryland and federal wage-hour laws. (*Id.* ¶¶ 27, 31.)

## II.

Under Rule 12(b)(6), a motion to dismiss should be treated as a motion for summary judgment when the motion to dismiss, or the exhibits in the record, present matters outside the nonmoving party's pleadings and the court does not exclude such matters. Fed. R. Civ. P.

2

12(b)(6). Because I must look beyond the four corners of the complaint in deciding this motion, I will treat it as a motion for summary judgment. *Holloway v. Potter*, No. JFM-05-3087, 2006 U.S. Dist. LEXIS 70044, at *3 (D. Md. Sept. 20, 2006) (unpublished). The court need not provide the parties with express notice of the conversion when, as here, the motion to dismiss has been alternately framed as a motion for summary judgment and the nonmoving party has submitted additional evidence outside the pleadings. *Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 490 (W.D. Pa. 2007).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that may affect the outcome of the suit. *Anderson*, 477 U.S. at 248. In assessing a motion for summary judgment, the court must view the facts, and all inferences justifiably drawn therefrom, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. The court must decide whether there is a genuine issue for trial, "not . . . weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249.

The City seeks dismissal of, or summary judgment on, Plaintiffs' claims on the grounds that Plaintiffs have failed to allege any nexus between their termination and the City, and have therefore failed to satisfy the pleading requirements of a retaliation claim brought under the FLSA. Defendant alleges that Plaintiffs "were under the direction and control of the State of Maryland through the Baltimore City Sheriff's Office," and that "Plaintiffs can not provide any evidence that the City had a role in their termination." (Def.'s Mem. 4.) Plaintiffs argue that

they were employed jointly by both the City and the State. (Pls.' Opp'n to Def.'s Mot. to Dismiss or in the Alternative Mot. for Summ. J. ("Pls.' Opp'n") 11.)

The retaliation provision of the FLSA renders it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). As the Fourth Circuit has recently stated:

> A plaintiff asserting a prima facie claim of retaliation under the FLSA must show that (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action.

*Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008); *see also Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 539 (1985). Once a prima facie case is established, the burden shifts to the defendant to provide a legitimate, non-discriminatory purpose for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997) (applying the *McDonnell Douglas* burden-shifting framework to an FLSA retaliation claim). If the defendant does so, the burden then shifts back to the plaintiff, who must prove that the employer's stated reason is merely pretextual. *McDonnell Douglas*, 411 U.S. at 804.

It is uncontested that Plaintiffs satisfied the first element of their prima facie claim by filing their initial FLSA lawsuit in February 2007. (Def.'s Reply to Pls.' Opp'n to Def.'s Mot. to Dismiss/Mot. for Summ. J. ("Def.'s Reply") 5.) As to the second element, Plaintiffs have suffered an adverse employment action in that they were terminated subsequent to the filing of

4

their lawsuit. However, the City contends that Plaintiffs cannot establish that the City as their "employer" had a role in their termination, as is required to prove the second element. (*Id.*) The City contends that the third element, causal connection, is even more tenuous given that Plaintiffs' only evidence is temporal proximity. (*Id.*)

### III.

In order to establish the second element of their prima facie claim, Plaintiffs must show that the City is their employer for FLSA purposes. The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Bonnette*, 704 F.2d at 1469. Under this broad definition, an individual may be the employee of more than one employer at a given time. *Schultz v. Capital Int'l Sec. Inc.*, 466 F.3d 298, 305 (4th Cir. 2006). And under the statute, "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the" FLSA. 29 C.F.R. § 791.2(a).

Rather than rely on any technical test, the Supreme Court has held that under the FLSA, courts should apply an "economic reality" test to determine whether an employment relationship exists. *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985). While no one factor or set of factors is decisive, the following four factors have been utilized by courts conducting such an analysis: (1) the authority to hire and fire employees; (2) the authority to supervise and control employee work schedules or conditions of employment; (3) the authority

to determine the rate and method of payment; and (4) maintenance of employment records. *Bonnette*, 704 F.2d at 1470; *Brickey v. County of Smyth, Va.*, 944 F. Supp. 1310, 1315 (W.D. Va. 1996). These four factors "provide a useful framework for analysis in this case, but they are not etched in stone and will not be blindly applied. The ultimate determination must be based 'upon the circumstances of the whole activity.'" *Bonnette*, 704 F.2d at 1470 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

In the instant case, the parties have presented competing evidence as to Baltimore City's status as Plaintiffs' employer. I will discuss the evidence relevant to each of the four factors in turn.

**A. Authority to Hire and Fire Employees**

The City states that Plaintiffs were hired to work "at [the] pleasure" of the Sheriff (Def.'s Mem. Ex. 1), who is an employee of the State. Md. Code Ann., State Gov't § 12-101(a)(6) (2008).[2] The City contends that it had no role in the hiring or firing of Plaintiffs or any other employees of the Baltimore City Sheriff's Office. (Def.'s Mem. 4, 13; Def.'s Reply Ex. 4 ¶ 6.) All Baltimore City employees, except those specifically excluded by Article VII, § 99 of the

---

[2] The statute includes as "state personnel" "a sheriff or deputy sheriff of a county or Baltimore City." The statute does not explicitly include employees of a county or Baltimore City sheriff's office as state personnel. Although not relied upon by Plaintiffs, I note that the statute does include, by contrast, "a State's Attorney of a county or Baltimore City, *or an employee* of an office of a State's Attorney," Md. Code Ann., State Gov't § 12-101(a)(8) (emphasis added), "a member of a board of license commissioners of a county or Baltimore City appointed under the provisions of Article 2B of the Code, *or an employee* of a board of license commissioners," Md. Code Ann., State Gov't § 12-101(a)(9) (emphasis added), "a member of a local board of elections, *or an employee* of a local board of elections," Md. Code Ann., State Gov't § 12-101(a)(10) (emphasis added), "a judge of a circuit court of a county or Baltimore City, *or an employee* of a circuit court," Md. Code Ann., State Gov't § 12-101(a)(11) (emphasis added), "a judge of an orphans' court of a county or Baltimore City, *or an employee* of an orphans' court." Md. Code Ann., State Gov't § 12-101(a)(12) (emphasis added).

Baltimore City Charter, are members of the Civil Service and are subject to the discipline and termination policies and procedures of the Baltimore City Civil Service Commission. (Def.'s Reply Exs. 1, 2.) The City asserts that Plaintiffs, as dispatchers for the Sheriff's Office, were neither included in the enumerated exceptions nor subject the Civil Service Commission Rules. (Def.'s Reply 12.) It follows, the City argues, that the Plaintiffs were never understood to be City employees and that the City had no role in their termination. (*Id.* 12-13.) The City also notes that Plaintiff Jackson's termination notice[3] was signed by the Assistant Sheriff, and that Plaintiffs have failed to name a single City employee or agency involved in their termination. (Def.'s Mem. Ex. 2; Def.'s Reply 9.) The City points to an email exchange between the parties' counsel as evidence that the City had no knowledge of the facts or circumstances of Plaintiffs' termination until after they were terminated. (Def.'s Reply 6 n.1 (*citing* Pl.'s Opp'n Ex. 1).)[4]

This email exchange does not, however, clearly indicate that the City had no role in the termination. Similarly, Plaintiffs argue that nothing in the letter from the Assistant Sheriff to Plaintiff Jackson advising her of her termination states that the City was not her employer for FLSA purposes. (Pls.' Opp'n 25 n.8.) Plaintiffs make the same argument regarding the forms acknowledging that Plaintiffs were hired to work at the pleasure of the Sheriff. (*Id.* 16-17 n.5.)

---

[3] At present, the record contains no formal termination notice for Plaintiff Blackwell.

[4] The email from Plaintiffs' counsel to Defendant's counsel on March 4, 2008 addresses an issue related to the settlement of the first lawsuit and then asks:
> Are you aware that the City Sheriff recently fired both Ms. Jackson and Ms. Blackwell? Do you have any facts or explanation about the terminations and basis for the terminations? If so, I would appreciate you sharing such information. If not, it seems that there may be some further FLSA litigation, concerning retaliation.

(Pls.' Opp'n Ex. 1.) The response from Defendant's counsel on the same date states that she "can confirm that Ms. Blackwell and Ms. Jackson have been terminated. I have no further information." (*Id.*)

7

To the contrary, Plaintiffs were required to complete City applications for employment, as well as forms entitled "City of Baltimore Functional Capacities Form," and "Medical History Form – Baltimore City" at the time of their hire. (*Id.* 16.) Plaintiff Jackson has also produced a "City of Baltimore / Employee Exit Interview" form that she alleges she was instructed to complete immediately after she was notified of her termination. (*Id.* 24; Pls.' Opp'n Ex. 6, Attachment W.) The first instruction on the form states: "1. Prepare this form upon notification of separation of any employee from City employment." (Pls.' Opp'n Ex. 6, Attachment W.) Plaintiffs also cite as evidence of the City's involvement in their termination the fact that the City argued for the denial of Plaintiffs' claims for unemployment benefits to the Maryland Division of Unemployment Insurance on the merits and never argued that it was not their employer. (*Id.* 24.)

Viewing the facts in the light most favorable to Plaintiffs and without further discovery, it is unclear what, if any, role the City played in the hiring and firing of Plaintiffs. There remains a genuine issue of fact as to the City's authority to hire and fire dispatchers of the Baltimore City Sheriff's Office.

**B. Authority to Supervise and Control Employee Work Schedules or Conditions of Employment**

There is little evidence in the record at this point as to who controlled Plaintiffs' work schedules. However, Plaintiffs allege that they were required to sign a memorandum containing information regarding the "Baltimore City Attendance Monitoring Program" and were also required to complete and submit City personnel forms when requesting time off. (Pls.' Opp'n 18.) Plaintiff Jackson also alleges that when she was disciplined for attendance problems, she was disciplined in accordance with and provided a copy of the City's Attendance Monitoring

8

Program.  (Pls.' Opp'n Ex. 6 ¶ 8.)  This program governs "[a]ll members of this agency [Baltimore City Sheriff's Office] who are not State Classified Employees."  (Pls.' Opp'n Ex. 6, Attachment D; *see also* Pls.' Opp'n Ex. 6, Attachment F.)  The job posting for the dispatcher position explicitly states that it is a "non-classified position."  (Pls.' Opp'n Ex. 6, Attachment N.)  Therefore Plaintiffs argue that, as dispatchers, they were governed by the City's attendance policy.  Plaintiffs allege that they were also expressly told "by management" that the City's attendance program applied to them because they were City employees.  (Pls.' Opp'n Ex. 6 ¶ 12; Ex. 7 ¶ 10.)

Though the evidence as to who controlled Plaintiffs' work schedules is minimal, there is evidence pertaining to the City's control over the conditions of Plaintiffs' employment.  Plaintiffs allege that they were "repeatedly advised by superiors" that their employment was governed by the City of Baltimore's Administrative Manual, a copy of which was maintained at their work site.  (Pls.' Opp'n Ex. 6 ¶¶ 9-10; Ex. 7 ¶¶ 7-8.)  The Administrative Manual states that it "communicates official City policies and procedures which effect [sic] City employees."  (Pls.' Opp'n Ex. 6, Attachment E.)  Plaintiffs note that the manual contains detailed rules for City employees as well as several policies explicitly applicable to City employees, including the Family Medical Leave Act rules for City employees,[5] the City COBRA policy, and the City policy for meal periods and shift differentials which Plaintiffs were told governed them.  (Pls.' Opp'n Ex. 6 ¶ 11.)  Plaintiffs received several other employment-related benefits through the City, including benefits for health, disability, vision and dental care, life insurance, and death

---

[5] Plaintiffs cite to a bulletin they received advising them of changes to the City's FMLA policy with the heading "Attention: All Baltimore City Employees."  (Pls.' Opp'n Ex. 6, Attachment E.)

and accident benefits. (Pls.' Opp'n Ex. 6 ¶ 13.) When hired as dispatchers, Plaintiffs took a drug test at a City health clinic and were advised that they were required to comply with the City's drug-free workplace policy. (Pls.' Opp'n 17.)

Plaintiffs state that they were invited by the City of Baltimore Department of Human Resources to participate in the City of Baltimore's Open Enrollment, which Plaintiffs allege is only available to City employees. (Pls.' Opp'n Ex. 6 ¶¶ 15-16.) The Open Enrollment notice directed Plaintiffs to a City-maintained and sponsored website which contained several benefit forms for which only City employees were eligible. (*Id.* ¶¶ 17-18.)

Other evidence presented by Plaintiffs, including several memoranda and documents addressing them as City employees or discussing benefits or policies applicable to City employees, indicates that the City exercised substantial control over the conditions of Plaintiffs' employment. The City argues, however, that it had no control over the Sheriff's Office command staff, so to say that it had control over the lower level civilian employees like Plaintiffs would be to ignore the "economic reality" of the situation. (Def.'s Reply 14.) This argument is based on the fact that "[t]he Sheriff and command staff of the Sheriff's Office are not members of the Civil Service or under the control of any City official in matters of personnel," and "[t]he City's Department of Human Resources has no authority to discipline command staff of the Sheriff's Office." (Def.'s Reply 14.) The Assistant Counsel of the Department of Human Resources of the City of Baltimore stated in an affidavit that all employees of the Sheriff's Office, including command staff, are entitled to the same healthcare benefits under the same terms as Baltimore City employees. (Def.'s Reply Ex. 4 ¶ 10.) Because those employees of the Sheriff's Office who are State employees also received these benefits, the

fact that Plaintiffs received City benefits does not necessarily indicate that Plaintiffs were City employees. The Assistant Counsel also stated that all employees of the Sheriff's Office are members of the State Retirement System. (*Id.* ¶ 12.)

It appears from the present record that, regardless of the City's control over the Sheriff's Office's command staff, there is evidence that the City did exercise influence over the conditions of Plaintiffs' employment. This factor therefore weighs in favor of Plaintiffs, particularly given the FLSA's explicitly expansive coverage.

**C. Authority to Determine the Rate and Method of Payment**

It is undisputed that the City was responsible for payroll and related functions in connection with Plaintiffs' employment as dispatchers for the Baltimore City Sheriff's Office. (Def.'s Mem. 11.) Plaintiffs' paychecks were issued by the City's Central Payroll Division and each pay stub was captioned "Mayor and City Council of Baltimore Employee Earnings Statement." (Pls.' Opp'n Ex. 6, Attachment J.) Plaintiffs' W-2 forms identify Plaintiffs' "Employer" as the "Mayor and City Council of Baltimore." (Pls.' Opp'n Ex. 6, Attachment K.) A 2004 Baltimore City Board of Estimates memorandum produced by Plaintiffs indicates that the Board had the authority to determine the pay grade of Sheriff's Office dispatchers. (Pls.' Opp'n Ex. U.) Additionally, the City's Labor Commissioner had jurisdiction over the Plaintiffs' internal employee complaints for not being paid properly under City policy. (Pls.' Opp'n 26.) This factor clearly weighs in favor of a determination that the City was Plaintiffs' employer.

**D. Maintenance of Employment Records**

In connection with its payroll functions, the City prepared and maintained Plaintiffs' employment pay records and W-2 forms. (Pls.' Opp'n 22.) Plaintiffs also assert that their

attendance records were kept on City forms, submitted to City payroll, and maintained at City offices.  (*Id.* 19.)  According to Plaintiffs, the City assigned each dispatcher a Fair Labor Standards Act "code" number, which was included on a "City of Baltimore / FLSA Assigned Form."  (Pls.' Opp'n Ex. 6, Attachment V.)  Plaintiffs were also assigned City class numbers and job numbers when hired as dispatchers.  (Pls.' Opp'n Ex. 6, Attachment A.)  Plaintiffs also note that in conjunction with their City health and dental benefits, they were issued health insurance and dental cards by the City as well as employee benefit confirmation statements.  (Pls.' Opp'n Ex. 6 ¶ 14; Attachment G.)

No single factor in this analysis is dispositive.  The evidence as to the first factor is mixed, and the other three of the four factors point to the existence of an employer-employee relationship for FLSA purposes.  Even if the City's status as an employer cannot be determined definitively based on the existing record, Plaintiffs have produced sufficient evidence to establish the second element of their prima facie case.  *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979)("The presence of any individual factor is not dispositive of whether an employee/employer relationship exists."); *Cai v. Fishi Café, Inc.*, No. C-05-03175 EDL., 2007 WL 2781242, at *5 (N.D. Cal. Sept. 20, 2007) (unpublished) (applying the *Bonnette* factors and denying defendant's motion for summary judgment on plaintiff's FLSA claim because "there is some evidence which, taken in the light most favorable to Plaintiff, raises an inference of at least some control over the monies of the restaurants and hiring and firing"); *Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1175, 1181 (N.D. Okla. 2006) (considering the "economic realities" of the employment relationship and finding defendant to be a joint employer of plaintiff for purposes of FLSA liability when two of the four *Bonnette* factors

weighed in favor of joint employment).

## IV.

For the third element of the retaliation claim, the causal relationship between Plaintiffs' protected activity and the adverse employment action, Plaintiffs rely on temporal proximity to infer causation. "Normally, very little evidence of a causal connection is required to establish a *prima facie* case. In fact, we have held that merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient to make a *prima facie* case of causality." *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998) (internal citations and quotations omitted). Plaintiffs' first lawsuit was filed in February 2007 and settled in January 2008. (Compl. ¶¶ 9, 17.) Plaintiffs were terminated in February 2008. (Compl. ¶¶ 21, 22.) Several courts have found that a period of six months to a year between the protected activity and the adverse employment action is, without other evidence of causation, insufficient as a matter of law to establish a prima facie case of retaliation.[6] *See, e.g.*, *Brown v. Duke Energy Corp.*, No. 3:97CV404-V, 2000 U.S. Dist. LEXIS 3299, at *5-6 (W.D.N.C. Feb. 8, 2000) (unpublished) and cases cited therein; *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that temporal proximity can only be used to infer causal connection when the proximity in time between the employer's knowledge of the protected activity and the adverse employment action is "very close."); *Bragg v. Orthopaedic Assocs. of Va., Ltd.*, No. 2:06cv347,

---

[6] It is not clear from the record whether the City engaged in any retaliatory conduct or displayed any animus toward Plaintiffs in the period between the filing of their initial complaint and their termination. Without conducting discovery, Plaintiffs rely on temporal proximity alone to establish their prima facie case. (Pls.' Opp'n 27.)

2007 U.S. Dist. LEXIS 14836, at *27-28 (E.D. Va. Mar. 2, 2007) (unpublished) ("[T]he passage of eleven months between the alleged protected activity and the alleged constructive discharge cannot, by itself, provide the causal link required for the plaintiff to make a prima facie case of retaliation.").

However, in the context of Title VII or the Age Discrimination in Employment Act ("ADEA"), both of which apply the same three-factor analysis as is applied in an FLSA retaliation claim, several courts have understood the plaintiff's protected activity to continue through the time of a settlement agreement for purposes of determining temporal proximity to the adverse employment action.  *See, e.g.*, *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir. 1986) (finding summary judgment in favor of employer inappropriate when layoffs occurred less than two months after EEOC settlement agreement was negotiated); *Russel v. Bd. of Pub. Edu. of the Sch. Dist. of Pittsburgh*, No. 06-cv-1668, 2008 U.S. Dist. LEXIS 84308, at *14 (W.D. Pa. Oct. 21, 2008) (unpublished) (determining that plaintiff's protected activity under Title VII continued until the settlement agreement for his prior lawsuit was fully executed); *Gaston v. United States Postal Serv.*, No. 05-CV-5286, 2008 U.S. Dist. LEXIS 51223, at *8 (D.N.J. July 2, 2008) (unpublished) (finding plaintiff's entrance into a settlement agreement to be the last protected activity for Title VII retaliation purposes); *Williams v. Potter*, 316 F. Supp.2d 1122, 1137-38 (D. Kan. 2004) (same); *Adams v. Calvert County Pub. Schs.*, 201 F. Supp. 2d 516, 520 (D. Md. 2002) (assessing causal connection based on the period between the signing of a settlement agreement and the adverse action, but finding the twenty-four months between the settlement agreement and adverse action too long to establish causal connection without other evidence).  And while the Fourth Circuit and other courts "have looked to Title VII

cases in interpreting the FLSA," the Fourth Circuit has cautioned that "we must take care to respect any differences in language and purpose between Title VII and the FLSA," including the differences in protected activities enumerated in those statutes' retaliation provisions. *Darveau*, 515 F.3d at 342.

Title VII prohibits retaliation against an employee who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that title, 42 U.S.C. § 2000e-3(a),[7] whereas the less expansive retaliation provision of the FLSA protects an employee who "has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act . . . or has testified or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3). The Fourth Circuit has interpreted the FLSA retaliation provision to require the institution of a formal proceeding, as opposed to an internal complaint to a supervisor or a proceeding that is merely pending or anticipated, but has also stated that "it is enough that the *testimony* be impending or anticipated." *Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 365 (4th Cir. 2000) (emphasis in original).

Given the broad remedial purposes of the FLSA, I interpret the retaliation provision such that from the time Plaintiffs filed a complaint in federal court until they entered into a settlement agreement with the City, their testimony in the proceeding was pending or anticipated. Therefore, given the temporal proximity between the settlement of the previous case and Plaintiffs' termination, I find that Plaintiffs have satisfied their minimal burden of establishing a prima facie case of retaliation.

---

[7] The pertinent language of the ADEA retaliation provision is identical except that provision uses the word "litigation" where Title VII uses the word "hearing." 29 U.S.C. § 623(d).

The burden then shifts to the City to prove they terminated Plaintiffs for a legitimate, non-discriminatory reason. Because the City contends that it was not Plaintiffs' employer and therefore had no role in their terminations, it argues that it cannot (and need not) provide any legitimate, non-discriminatory reasons for the termination. (Def.'s Reply 6.) Since Plaintiffs have met their burden of establishing a prima facie case of retaliation and the City has failed to rebut Plaintiffs' claim, I deny the City's motion to dismiss, or in the alternative, for summary judgment.[8]

A separate order effecting the rulings made in this memorandum is being entered herewith.

Date: July 14, 2009

/s/

J. Frederick Motz
United States District Judge

---

[8] For the same reasons discussed herein, I also deny the City's motion as to Plaintiffs' state law claim. *See Cross v. Bally's Health & Tennis Corp.*, 945 F. Supp. 883, 890 (D. Md. 1996) ("[I]t appears that Maryland's courts would apply the same criteria [under Maryland Labor and Employment Code Annotated Section 3-428(a)(3)] as are used in the FLSA cases to determine if retaliation occurred.").